IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

Mosaic Potash Carlsbad, Inc.,

          Plaintiff,
          Counterclaim
          Defendant

vs.

Intrepid Potash, Inc., Intrepid Potash—
New Mexico, LLC, and
Steve Gamble,

          Defendants,
          Counterclaimants.

_____

Case Nos. 2:16-cv-00808-KG-SMV
               2:17-cv-01268-KG-SMV

**CONSOLIDATED COMPLAINT**

## INTRODUCTION

1.    Plaintiff Mosaic Potash Carlsbad, Inc.'s ("Mosaic") former employee Defendant Steve Gamble ("Gamble") misappropriated Mosaic's trade secrets and stole and converted Mosaic's electronic files, including confidential files, concerning Mosaic's processes for manufacturing a premium agricultural product from the mineral langbeinite ("Lang").  Gamble did so with the aid, encouragement, and agreement of Mosaic's competitor (and his former employer) Defendant Intrepid Potash—New Mexico, LLC and its parent, Intrepid Potash, Inc. (collectively, Intrepid Potash—New Mexico LLC and Intrepid Potash, Inc. are referred to as "Intrepid").

2.    Mosaic's proprietary, confidential, and trade secret methods for processing and "granulating" (i.e., forming a pellet from) Lang previously provided a distinct

competitive advantage over Intrepid—Mosaic was able to recover about 80% of the Lang it mined whereas Intrepid only recovered about 30%.  Mosaic carefully guarded this information by implementing computer network security measures and entering into a Confidentiality Agreement with its employees, including Gamble, among other things. However, Gamble, while still a Mosaic employee but after he had secretly accepted a job offer with Intrepid, wrongfully accessed Mosaic's computers without authority and in excess of  his authority, and copied hundreds of Mosaic's electronic files, including entire folders of research and development, with the intent to use these files at Intrepid.  He viewed these files using while working for Intrepid and used them, along with his knowledge of Mosaic's confidential information concerning its processing and granulation methods, to assist Intrepid in a redesign of its Lang processing facility.  This redesign substantially increased Intrepid's Lang production and recovery efficiency. Gamble also assisted Intrepid in improving its methods for granulation of Lang.

3.      Further, after beginning work at Intrepid and as its agent, Gamble wrongfully accessed Mosaic's computers without authority, deleting Mosaic Outlook files and forwarding others to himself through email.  As Intrepid's employee and agent, Gamble destroyed the Mosaic electronic files that he had stolen thereby permanently depriving Mosaic of its property.

4.      Accordingly, Mosaic brings this action against Gamble and Intrepid for misappropriation of trade secrets, breach of the Confidentiality Agreement, tortious interference with the Confidentiality Agreement, breach of fiduciary duty, violation of the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030, conversion, and civil

conspiracy.  Mosaic seeks injunctive and other equitable relief, to prevent further irreparable harm to it, and compensatory and punitive damages for defendants' willful, malicious, and unlawful conduct.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, 18 U.S.C. § 1030.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims asserted herein. The Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and this action is between citizens of different states.

6.     This Court has personal jurisdiction over Intrepid Potash, Inc., because it systemically conducts business and owns property in this District.  This action arises from its business and tortious activity in this District.

7.     This Court has personal jurisdiction over Intrepid Potash—New Mexico, LLC because it is a New Mexico limited liability company with its principal place of business in this District.

8.     This Court has personal jurisdiction over Gamble because he resides and is domiciled in Eddy County, New Mexico.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that "a substantial part of the events giving rise to the claim occurred" in this District.

## PARTIES

10.     Mosaic is a Delaware corporation with its principal place of business in Plymouth, Minnesota.

11.     Intrepid Potash, Inc. is a Delaware corporation with its principal place of business in Denver, Colorado.

12.     Intrepid Potash—New Mexico, LLC is a limited liability company organized under the laws of New Mexico.  Intrepid Potash, Inc. is the sole member of Intrepid Potash—New Mexico, LLC.

13.     Gamble is the former Superintendent of Applied Process Technology at Mosaic.  He is currently employed by Intrepid as a Senior Process Advisor.

## STATEMENT OF FACTS

**A.     Mosaic's History and Lang Processing**

14.     Mosaic is a leading producer of potash minerals, which are used to make fertilizer products for agricultural crops.  Potash minerals are minerals that contain potassium.  One such mineral is Lang, which is particularly advantageous as a fertilizer for sensitize crops due to the presence of magnesium and the absence of chlorides.  Due to its advantages, fertilizer products made with Lang command a premium price.

15.     Lang is found in commercial quantities in North America only in the Carlsbad basin, where Mosaic operates an underground mine outside of Carlsbad in Eddy County, New Mexico.

16.     Mosaic mines Lang underground, brings it to the surface in the form of rocks, and then processes it on site at its Lang processing and granulation plants into "pellets" through a process known as "granulation."

17.     These pellets are a premium agricultural fertilizer product sold by Mosaic under the trademark K-Mag®.  This premium fertilizer product is generally used for high-value, sensitive crops such as citrus or tobacco.

18.     Mosaic was formed in October 2004 following the merger of a business unit of Cargill, Inc. and IMC Global Operations Inc. that created Mosaic's parent company.  Mosaic or its predecessor companies have been mining and processing Lang since 1939.  Through years of experience, Mosaic has developed processes to recover 80% of the Lang it mines.

19.     The details of Mosaic's processes are confidential and proprietary, and include the use of several trade secrets.  Generally speaking Mosaic mines ore, separates the Lang, and then "granulates" the Lang using a binder.  The confidential and proprietary details of the processes are stored electronically on Mosaic's computer servers.  Employees' access to these electronic documents, and the disclosure of Mosaic confidential information, is restricted and governed by passwords, confidentiality agreements, and policies set forth in Mosaic's Technology Resources Acceptable Use policy and its Code of Business Conduct and Ethics.

### B.  Intrepid's History and Operations

20.  Intrepid is another producer of potash minerals and is Mosaic's only competitor in North America for the mining and processing of Lang.  It operates a mine approximately 10 miles away from Mosaic's Carlsbad mine.

21.  The Lang that Intrepid mines, processes, and granulates is marketed under the trade name Trio.

22.  Trio and K-Mag are sold throughout the United States and are the only two Lang fertilizers in the United States.

23.  Intrepid began mining and processing Lang in approximately 2006, and after investing over $85 million dollars in a processing system and granulation plant, Intrepid was able to recover only about 30% of the Lang it mined before it hired Gamble, while, placing Intrepid at a significant competitive disadvantage compared to Mosaic's 80% recovery efficiency.  Intrepid's inability to increase Lang recovery, despite significant investment, caused Intrepid to be in dire financial straits by 2014.

### C.  Gamble's Employment with Mosaic and Unauthorized Access of Computers to Copy Mosaic's Confidential and Proprietary Files

#### 1.  Gamble's Experience with Moasic

24.  Gamble was hired by Mosaic's predecessor in 1976.  In total, he worked for Mosaic or its predecessor for 39 years, until December 31, 2014.  Throughout his tenure with Mosaic, Gamble played a significant role in Mosaic's research and development of technologies and processes over the last 30 years. During that time he was given access to and made aware of Mosaic's confidential and trade secret information in order for him to

perform his duties.  Such information includes information pertaining to Mosaic's technologies, processes and products, both in existence and under development, Mosaic's manner of operations and plans, as well as its customers, product pricing, strategy, and financial information.

25.     During his tenure at Mosaic, Gamble also gained knowledge of the location on Mosaic's computer servers of Mosaic's confidential and proprietary information regarding Mosaic's Lang processing.

26.     For example, during his employment with Mosaic, and before that during his employment with Mosaic's predecessor, Gamble worked in research and development and was for many years the Manager of Research and Development.  The department was later renamed to Applied Process Technology and he was the Superintendent of Applied Process Technology at the time he left Mosaic.  As part of his work with Mosaic's predecessor, Gamble was involved in the design and construction of a new Lang processing plant in the late 1990s.  The design of this plant allowed higher recovery of Lang, and Gamble knew where to find confidential and proprietary information regarding the design of the plant and other confidential information regarding Mosaic's Lang processing and granulation on Mosaic's computer servers.

27.     Gamble also led or participated in the ongoing research and development done to improve and optimize operations in Mosaic's plant.  As a result, he had intimate knowledge of Mosaic's confidential and proprietary information associated with the processes used there.  He knew where to find such information on Mosaic's computer servers.

28.     Gamble also had knowledge of Mosaic's confidential and proprietary information regarding flotation for the mining and processing of MOP (muriate of potash), processes for the manufacture of its new fertilizer product Aspire®, and electrostatic separation for Lang.  And, he knew where to find such confidential and proprietary information on Mosaic's computer servers.

### 2.     The Confidentiality Agreement and Mosaic's Policies Protecting Confidentiality

29.     In order to protect against the unauthorized use and disclosure of Mosaic's confidential trade secret information, Gamble was required to sign an "Employee Confidential Information, Inventions, and Original Works of Authorship Agreement" (hereinafter the "Confidentiality Agreement") on October 15, 2004.  A copy of the Confidentiality Agreement is attached hereto as Exhibit "A."  The Confidentiality Agreement was a condition of Gamble's employment with Mosaic following the merger that created Mosaic's parent company.  All employees of Mosaic's predecessor IMC Potash Carlsbad, Inc. who wished to become employees of Mosaic were required to sign such a confidentiality agreement in order to be employed by Mosaic.

30.     Under the Confidentiality Agreement, Gamble agreed to the following pertinent provisions:

> I will not at any time, either during or after the termination of my employment with Mosaic, use, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any trade secrets of Mosaic or any confidential information of Mosaic except as required by my duties to Mosaic, by law or court order . . . . This includes without limiting the generality of the foregoing, information regarding any of its customers, the prices it obtains or has obtained from the sale of, or at which it sells or has sold, its products, or any other information concerning the business of

Mosaic, its manner of operation, its plans, processes, or other data.  I understand that the same are important, material, and confidential and may gravely affect the effective and successful conduct of Mosaic's business, and Mosaic's goodwill, and that any breach of the terms of this paragraph shall be a material breach of this agreement.

> **As such, I will not accept employment with any third-party employer in a job which, in essence, would require or compel me to provide Mosaic trade secrets or confidential information by virtue of the job duties that I would be required or expected to perform for the third-party employer.**

Exh. A (emphasis added).

31.     Gamble further agreed to the following language: "I understand that my misuse of computers . . . will greatly increase the potential for loss and compromise of Mosaic resources and/or information . . . .  Accordingly, I agree to:

> \*\*\*
>
> 2.  Follow Mosaic procedures for use, physical protection, access, file backup, privacy, security, and data confidentiality for Mosaic computers.
>
> \*\*\*
>
> 4.  Not provide access by non-Mosaic personnel (e.g., customers, suppliers, and contractors) to any Mosaic computer or network other than through approved Mosaic procedures and access methods.
>
> \*\*\*
>
> 10.  Not make any unauthorized transfer, print, copy, or reproduction of any computer software or related materials owned or licensed by Mosaic."

Ex. A.

32.     Gamble's access to, and use of, Mosaic's confidential and proprietary information and computers was governed not only by the Confidentiality Agreement but also Mosaic's employment policies and procedures.

33.     For example, in January 2013, Mosaic promulgated a Technology Resources Acceptable Use policy.  The policy prohibited employees from using Mosaic computers for "attempts to gain unauthorized access to data" or from using computers in a manner that would be "unlawful, unethical, or otherwise contrary to the Mosaic Code of Business Conduct and Ethics."  The Code of Business Conduct and Ethics, in turn, required employees to disclose conflicts of interest, including outside employment with competitors, and required employees to protect information and data from unauthorized disclosure.  The Code of Business Conduct and Ethics specifically admonished employees:  "Do not use Mosaic's proprietary or confidential information for personal benefit or the benefit of persons outside of the company."  The Code of Business Conduct and Ethics also gave examples of "proprietary and confidential information," which included "Business processes and systems," "know how," and "Research, formulas and technical data."

34.     To protect its electronic information, Mosaic also restricted access to various directories on its servers to limited groups of employees.

**3.     Gamble's Defection from Mosaic to Intrepid and Theft of Mosaic Documents**

35.     On or about September 2014, Mosaic offered early retirement to eligible employees including Gamble.  While Gamble was eligible for early retirement, Mosaic

did not want Gamble to retire and told him that it wanted him to continue working for

Mosaic.  Gamble suggested that he would like to work with Mosaic on a contract basis,

as he wanted to have more flexibility in his schedule to take care of his wife who was ill.

Therefore, Mosaic and Gamble began negotiating a consulting arrangement that would

provide Gamble with the flexibility and time off he desired while still being employed by

Mosaic.

36.     Nonetheless, on or about October 23, 2014, Gamble sent a letter seeking

employment to Intrepid's human resources manager.  Gamble stated that he was

responding to Intrepid's advertisement for an Environmental Engineer.  Gamble,

however, made clear that he was actually soliciting employment related to Intrepid's

Lang operations.  Gamble stated:  "I am confident that my skills and experience provide a

good match for this position and have the potential to provide you additional technical

benefits for your processes." Gamble further stated: "I would bring to your company a

broad range of skills and experience specific to Potash Processing including:

Environmental Management

Technical Services & Quality Control Management

Production Process Engineer: Sylvite, Langbeinite, and Potassium Sulfate

Processes." (emphasis added.)

37.     On October 27, 2014, Andy Levine of Intrepid sent Gamble an email with

the subject line "Intrepid Potash Career Open House – Oct. 28, Tuesday."

38.     On October 28, 2014, Gamble attended a job fair held by Intrepid.  At the

job fair, Gamble submitted an application for an Environmental Engineer position.

However, Gamble highlighted some of his research and development accomplishments with respect to Lang processing and Lang granulation.

39.   Between October 28, 2014, and November 13, 2014, Intrepid offered Gamble employment, not as an Environmental Engineer, but as a Senior Process Advisor. Gamble communicated to Intrepid by email on November 13, 2014, that he would like to accept Intrepid's offer.  Intrepid gave Gamble a written offer of employment on November 18 and Gamble accepted the next day.

40.   Gamble concealed from Mosaic that he had accepted employment with Mosaic's sole competitor in the Lang market, Intrepid, until December 2014.  Instead, Gamble misled Mosaic by purporting to continue negotiate for a consulting relationship with Mosaic.

41.   During the same time and after accepting Intrepid's employment offer on November 19, 2014, Gamble, without authority and in excess of his authority, accessed Mosaic's computers and copied hundreds of Mosaic's electronic files, including entire research and development folders, from Mosaic's server onto flash drives with the intent to use the files at his new position with Intrepid.  He then took those files with him upon his departure from Mosaic.  These files included proprietary and confidential diagrams, flowcharts, photographs, and spreadsheets, related to the layout of Mosaic's Lang processing plant and the processes used in Mosaic's Lang processing and granulation. The documents also included Mosaic's confidential binder specifications, confidential information related to its Lang recovery and granulation processes, including flow rates and other confidential data, as well as schematics clearly identified as confidential.

Access to this information was subject to the provisions of the 2004 Confidentiality

Agreement, Technology Resources Acceptable Use policy, and Code of Business

Conduct and Ethics.

42.     As an example of Gamble's unauthorized access or access exceeding his

authorization, on November 20, 2014, from approximately 7:30 pm until 9:00 pm – well

after Mosaic's normal business hours, Gamble, with the intent to use the files  at

Intrepid, accessed and downloaded confidential and proprietary Mosaic files concerning,

among other things, the critical dimensions of the tumbling drums that Mosaic uses in its

granulation process, the specific feed streams used for granulation, the specific sizing of

the feed streams into the granulation plant, the specific mix of starches used in

granulation, the specific strength of the solution used to create the starches, and the

research, development and testing of higher molecular weight starches for improvement

of the granulation process.

43.     On December 15, 2014, Gamble, without authority and exceeding his

authorized access with the intent to use the files at Intrepid, accessed and downloaded

confidential and proprietary Mosaic files concerning, among other things, the coating

agents for pellets used at the K-Mag plant, their formulations, and Mosaic's research,

development, testing, and analyses of coating agents for use at the K-Mag plant.  The

coating agents that Mosaic uses at its K-Mag plant have a significant impact on the

quality of Mosaic's final product and gives Mosaic a strong competitive edge over

Intrepid.

44.     On December 17, 2014, Gamble, without authority and exceeding his authorized access with the intent to use the files at Intrepid, accessed and downloaded confidential and proprietary Mosaic files concerning, among other things, all of the process simulator files that Mosaic used to design its K-Mag processing plant and all of the material flows for the granulation plant.  The process information in the simulator files were the basis for the entire design of the K-Mag plant and could be provided to an engineering contractor to replicate Mosaic's K-Mag plant.

45.     The confidential and proprietary files taken by Gamble with the intent to use at Intrepid included the entire detailed process flow of both Mosaic's Lang processing and granulation plants, sufficient that a competitor could use that data to nearly duplicate Mosaic's operations.

46.     On December 19, 2014, Gamble, without authority and exceeding his authorized access with the intent to use the files at Intrepid, accessed and downloaded confidential and proprietary Mosaic files concerning, among other things, Mosaic's research, development, testing, and analyses of binders for use in Mosaic's granulation process.

47.     On December 23, 2014, Gamble, without authority and exceeding his authorized access with the intent to use the files at Intrepid, accessed and downloaded confidential and proprietary Mosaic files concerning, among other things, Mosaic's tables summarizing research, development, testing, and analyses of binders for use in Mosaic's granulation process.

48.     On December 30, 2014, one day before the end of his employment at Mosaic, Gamble, without authority and exceeding his authorized access with the intent to use the files at Intrepid, accessed and downloaded confidential and proprietary Mosaic files concerning, among other things, Mosaic's critical parameters of the exact composition of the specially developed binder that Mosaic uses for granulation in its K-Mag plant.

49.     The directories accessed by Gamble on these dates were limited access directories, to which only a group of fewer than ten Mosaic employees had the system permissions to access the files.

50.     In addition to accessing and downloading confidential and proprietary Mosaic files with intent to use them at Intrepid, Gamble's unauthorized access and access exceeding his authorized access included deleting thousands of files from Mosaic's computers.

51.     In December 2014, Gamble finally informed Mosaic that he had accepted full-time employment at Intrepid.  Mosaic advised Gamble that if he wanted full-time employment, then Mosaic would employ him full-time.  Mosaic also reminded Gamble of his obligations under the Confidentiality Agreement, since employment with Intrepid would appear to violate that Agreement.  In subsequent correspondence with Mosaic, Gamble acknowledged his awareness of the Confidentiality Agreement; however, in his communications with Mosaic regarding his obligations under the Confidentiality Agreement, he expressed both verbally and in writing that he considers his knowledge of Mosaic's trade secrets to be his own personal knowledge and that he believes he is free to

use said knowledge without restriction.  At no time, did Intrepid inform Mosaic that it had hired Gamble.

52.    Gamble has admitted under oath that he downloaded Mosaic's files with the intent to use them at Intrepid.  He also admitted that he copied not only files but entire folders as well, each of which may have contained hundreds of Mosaic files.

53.    Gamble has admitted under oath that files were considered confidential by Mosaic and that he knew his actions were in breach of his duty of loyalty to Mosaic.

54.     By copying files from Mosaic's server to thumb drives with the intent to use such files at Intrepid, Gamble breached his duty of loyalty to his employer, Mosaic, and breached his obligations under the 2004 Confidentiality Agreement, the Technology Resources Acceptable Use policy, and the Code of Business Conduct and Ethics.

55.    Gamble's last day of employment with Mosaic was December 30, 2014, and he started at Intrepid on January 5, 2014.  Gamble's position with Intrepid was Senior Process Advisor and his duties with Intrepid were substantially similar, if not identical, to those he had with Mosaic.  As such, the nature of Gamble's employment with Intrepid required and compelled him to use and disclose Mosaic's confidential trade secret information.  Gamble's acceptance of employment with Intrepid, a direct competitor of Mosaic, constituted an intentional and material breach of the Confidentiality Agreement.

56.    Even after his last day at Mosaic, Gamble without authority accessed his Mosaic email.  For example, on January 11, 2015, Gamble without authority remotely logged onto his Mosaic email account.  He used his Mosaic account to forward emails

from his Mosaic account to his new Intrepid email account and his personal email account.  He also deleted hundreds of emails from his Mosaic account's inbox.

57.    To investigate Gamble's unauthorized access, and access exceeding authorization, of its computers, Mosaic retained forensics firms as well as counsel.  To restore data deleted by Gamble during his authorized access or access exceeding his authorization, Mosaic paid its third-party vendor to restore files.  The costs of this investigation and restoration have exceeded $5,000.

58.    Gamble's use and disclosure of Mosaic's confidential trade secret information to Intrepid as part of his work for Intrepid, has and continues to impose immediate, irreversible, and irreparable harm on Mosaic and its interests in the potash market and industry.  For example, Gamble has detailed specific knowledge of Mosaic's confidential processes, technologies, research and development associated with its production of a fertilizer product made from Lang called K-Mag®, a product that directly competes with Intrepid's Lang-product Trio®.  Gamble has detailed and specific knowledge, developed during his employment with Mosaic and at the significant expense of Mosaic, of Mosaic's granulation and recovery processes for K-Mag®, processes which result in efficiencies that are significantly greater than the efficiencies obtained by Intrepid for the recovery of its competing product, Trio®.  This confidential trade secret information was developed by Mosaic over many years and at a cost of many millions of dollars.

**D.     Intrepid's Use of Mosaic's Trade Secrets and Confidential Information Obtained from Gamble**

59.     Prior to employing Gamble, Intrepid publicly acknowledged that its recovery rates for Trio®, despite millions of dollars invested by it in a processing and granulation plant and subsequent re-design of specific elements of that plant, fell below its expectations and did not meet customer demand.  Accordingly, Intrepid chose to remedy its failure to meet expectations and market demand resulting from its inferior granulation and recovery processes by hiring Gamble in order to wrongfully acquire Mosaic's confidential and trade secret information, including information specific to Mosaic's superior granulation and recovery processes.

60.     Indeed, after starting his employment with Intrepid, Gamble copied Mosaic data he had wrongfully taken from Mosaic onto a laptop computer provided to him by Intrepid.  Furthermore, on or about January 21, 2015, shortly after beginning work for Intrepid, Gamble provided Intrepid with an in-depth analysis and advice on specific processes to be undertaken to convert Intrepid's processing plant to a facility similar to Mosaic's.  This analysis included use of Mosaic's confidential and proprietary information.

61.     Intrepid encouraged Gamble and provided incentives for Gamble to both convert Mosaic confidential and proprietary information and also to later use that information in his employment with Intrepid.  Intrepid offered Gamble a 20% increase to his base salary ($160,000 in total) to induce him to defect from Mosaic.  Intrepid additionally offered Gamble a signing bonus, a short-term performance-based bonus

targeted at 20% of his new base salary, and a long-term equity bonus also equal to an additional 20% of his base salary.  Intrepid  also was willing to pay Gamble a bonus of up to $210,000 to make up for any retirement benefits he lost due to his defection from Mosaic (although the outcome of negotiations with Gamble did not ultimately require Intrepid to pay this amount).

62. Intrepid encouraged, approved and ratified Gamble's unlawful conduct. Intrepid had knowledge that Gamble stole Mosaic files and uploaded at least seven of those files to its own systems.  Intrepid has acknowledged that Gamble's theft of Mosaic information (and uploading of that information to Intrepid's computer systems) violated the terms of:  Intrepid's offer of employment to Gamble, Intrepid's intellectual property policy, and Intrepid's employee handbook.  Yet, despite these violations of company policies, Intrepid did not discipline Gamble for his acts of:  stealing hundreds of Mosaic files, connecting all those files via a thumb drive to his Intrepid computer, or for uploading at least seven of those files onto his Intrepid computer.  Furthermore, Intrepid did not implement safeguards to prevent Gamble from using the information he converted from Mosaic or to prevent destruction of evidence related to Gamble's theft and use of information.  Rather than disciplining Gamble, Intrepid has promoted him—providing further incentive to continue using Mosaic's stolen confidential and proprietary information.

63. Intrepid knowingly and willfully conspired with Gamble to obtain and use Mosaic confidential and proprietary information related to Lang processing.  Beginning in 2010, Intrepid invested over $85 million into improving its Lang processing

capabilities with no result.  At the time, Intrepid noted in its SEC 10-K statement that "If

we are unable to increase our recoveries [of Lang] to more typical levels, we will have

less Trio product to sell which will have a negative effect on our revenues."  In 2010,

Intrepid was only recovering about 31% of mined Lang.  By 2013, after spending $85

million, Intrepid was still only recovering about 31% of mined Lang, and even then it

was unable to convert all of the recovered Lang into marketable pellets.  The result of this

failed investment put Intrepid in dire financial straits as decline in potash prices in 2015

heightened the need for improved Lang recovery and granulation.  Indeed, in 2010

Intrepid stock sold for between $19.47 and $37.65 but by 2015 had fallen to between

$2.63 and $17.64.

64.     In October 2015, after hiring Gamble and obtaining Mosaic's confidential

and proprietary information as a result of Gamble's misconduct, Intrepid publicly

announced the conversion of its facility to a Lang-only facility by mid-2016.  What

Intrepid could not do with $85 million and four years of work, it could now do with the

hiring of Gamble in one year.  Intrepid's announcement that it was converting its plant to

a Lang only facility quickly followed its report that it suffered an annual loss of

$524.8 million in 2015.  The rapid conversion of its facility, which was accomplished

using Mosaic's confidential and trade secret information, will save Intrepid millions of

dollars in research and development costs.  For the sake of comparison, Mosaic's current

annual research and development budget for the business line that makes and sells K-

Mag is between $35 and $40 million, and Mosaic's information at issue here was

developed over the course of 75 years.  The increased recovery of Lang by Intrepid, will also cost Mosaic millions in dollars due to the effects on the market for pelletized Lang.

65.     Similarly, Gamble also has knowledge of Mosaic's research and development of Aspire®, a new potash product, for which Intrepid has no competitive product. With Mosaic's confidential trade secret information regarding the development of Aspire®, acquired from Gamble, Intrepid will be able to produce a competing product without spending the time and money Mosaic did in developing the product.

66.     These technologies, processes, research and development -- belonging to Mosaic and developed at great expense and investment by Mosaic -- related to granulation and recovery of potash and new potash product development, as well as other confidential information provided to Gamble during his employment with Mosaic, are trade secret information neither known nor available in the public domain and which provide Mosaic with a distinct and significant competitive advantage over its competitors including Intrepid.  Gamble's use and disclosure of Mosaic's trade secrets will destroy Mosaic's competitive advantage and cause significant pecuniary and non-pecuniary damage to Mosaic.

67.     To immediately mitigate and resolve this matter without court intervention, Mosaic sent written correspondence to both Gamble and Intrepid.  In doing so, Intrepid was placed on actual notice of Gamble's Confidentiality Agreement with Mosaic and his obligations thereunder.  Nevertheless, Intrepid employed Gamble, who assisted Intrepid with a re-design of its Lang processing plant and with improvement of Intrepid's

granulation methods.  As a result, with Gamble's assistance, Intrepid substantially increased its Trio® production.

## COUNT I

**(Violation of the New Mexico Uniform Trade Secrets Act—Against All Defendants)**

68.     Mosaic hereby re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-67 above.

69.     Mosaic's trade secrets at issue are within the scope of the New Mexico Uniform Trade Secrets Act ("UTSA").  NMSA 57-3A-2(D).

70.     Defendants' conduct, as described above, constitutes actual and/or threatened misappropriation of Mosaic's trade secrets as contemplated by the UTSA. NMSA 57-3A-2(A)-(D).

71.     Mosaic hereby seeks injunctive relief, as described below, for the actual and/or threatened misappropriation of Mosaic's trade secrets by Defendants.  NMSA 57-3A-3.

72.     Mosaic also seeks to recover any and all monetary relief to which it is entitled against Defendants, including damages for actual loss and unjust enrichment. NMSA 57-3A-4(D).

73.     Defendants willfully and maliciously misappropriated Mosaic's trade secrets, and, therefore, Mosaic is entitled to recover exemplary damages and its attorneys' fees.  NMSA 57-3A-4, 5.

## Count II

### (Breach of Contract—Against Gamble)

74.     Mosaic hereby re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-73 above.

75.     Gamble's employment with Intrepid and his use and disclosure of Mosaic's confidential trade secret information, and electronic data, as part of his employment with Intrepid constitute Gamble's breach of the Confidentiality Agreement.

76.     Mosaic hereby seeks injunctive relief, as described below, to prevent further harm to Mosaic arising from Gamble's breach of contract.

77.     Mosaic also seeks to recover any and all monetary relief to which it is entitled against Gamble including damages arising from Gamble's breach of contract, including exemplary damages and its attorneys' fees.

## Count III

### (Breach of Fiduciary Duty—Against Gamble)

78.     Mosaic hereby re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-77 above.

79.     As a former employee of Mosaic, Gamble owes Mosaic a fiduciary duty, namely a duty of loyalty, which includes a duty not to use or disclose Mosaic's confidential trade secret information. Gamble taking, use and disclosure to Intrepid of Mosaic's confidential trade secret information constitute breaches of his duties to Mosaic.

80.     Mosaic hereby seeks injunctive relief, as described below, to prevent further harm to Mosaic arising from Gamble's breach of his duties to Mosaic.

81.     Mosaic also seeks to recover any and all monetary relief to which it is entitled against Gamble including damages arising from Gamble's breach of his duties to Mosaic, including exemplary damages and its attorneys' fees.

## Count IV

### (Tortious Interference with Existing Contract—Against Intrepid)

82.     Mosaic hereby re-alleges and incorporates by reference the allegations set forth in Paragraphs 1-81 above.

83.     At all times relevant, Intrepid had both constructive and/or actual knowledge of Gamble's Confidentiality Agreement with Mosaic and Gamble's obligations and duties to Mosaic thereunder.  By offering Gamble employment and employing Gamble despite being aware of the Confidentiality Agreement, Intrepid induced Gamble to breach the Confidentiality Agreement.  Intrepid's actions played an active and substantial part in causing Mosaic to lose the benefits of the Confidentiality Agreement – specifically, the protection from the unauthorized use, disclosure, and misappropriation of Mosaic's confidential trade secret information.  Accordingly, Intrepid has tortiously interfered with the Confidentiality Agreement, an existing contract between Mosaic and Gamble.

84.     Mosaic hereby seeks injunctive relief, as described below, to prevent further harm to Mosaic arising from Intrepid's tortious interference with the Confidentiality Agreement.

85.     Mosaic also seeks to recover any and all monetary relief to which it is entitled against Intrepid including damages arising from Intrepid's tortious interference with the Confidentiality Agreement, including exemplary damages and its attorneys' fees.

## Count V

### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030—Against All Defendants)

86.     Mosaic realleges and incorporates by reference the allegations asserted in numbered paragraphs 1 through 85 of this Complaint.

87.     Gamble accessed a protected computer or computers at Mosaic that were used in or affected interstate commerce or communication.

88.     Gamble's access of Mosaic's computer(s), including for the purposes of downloading confidential and proprietary information that he used for the benefit of Intrepid and deleting files to conceal his misconduct, was unauthorized and beyond the scope of access for which he was authorized.

89.     Gamble's access of Mosaic's computer(s) was with intent to defraud and in furtherance of a scheme to defraud.

90.     Gamble intentionally accessed Mosaic's computer(s) without authorization, and as a result, caused damage and loss in the form of deleted files and emails.

91.     Gamble's access to Mosaic's computer(s) was conduct committed in the scope of his agency with Intrepid and taken in view of furthering Intrepid's interests.

92.     As a result of Gamble's unauthorized access, and access exceeding his authorized access, of Mosaic's computers, he obtained information worth hundreds of millions of dollars.

93.     As a result of Gamble's unauthorized access, and access beyond his scope of authority, of Mosaic's computers, Mosaic has suffered losses in excess of $5,000 in costs to investigate Gamble's actions and restore data.

94.     As a result of the conduct of Gamble and Intrepid, Mosaic has suffered and will continue to suffer irreparable injury such that there is no adequate relief at law, and equitable relief must be granted.  Mosaic has also suffered tangible economic harms; compensatory damages for which are in the millions of dollars.  Accordingly, Mosaic is entitled to both equitable and legal relief.

## COUNT VI

### (Conversion—Against All Defendants)

95.     Mosaic re-alleges and incorporates by reference the allegations asserted in numbered paragraphs 1 through 94 of this Complaint.

96.     Gamble downloaded onto USB thumb drives, and otherwise copied, hundreds of electronic files containing Mosaic confidential and proprietary information. Gamble's acts were without authorization and with the intent to use the files at Intrepid. These acts were within the scope of his agency with Intrepid and taken in view of furthering Intrepid's interests.

97.     Gamble converted these files for his benefit and Intrepid's benefit and took them to his job at Intrepid where he connected the thumb drives containing the files and

uploaded some of them to Intrepid's computers and made use of the data in assisting Intrepid with Lang processing causing competitive injury of Mosaic.

98.     Mosaic's forensic examination revealed that after Gamble had accepted Intrepid's job offer he connected thumb drives to Mosaic's computers and servers and by his own admission under oath copied hundreds of files and folders from those directories onto the thumb drives with the intent to use that information at Intrepid.  When Mosaic requested that he produce the thumb drives, Gamble individually and as an employee and agent of Intrepid failed to produce them and claimed that he had destroyed the thumb drives after receiving a letter from Mosaic threatening litigation.  By destroying the thumb drives, Gamble, as an employee and agent of Intrepid, and for his benefit and the benefit of Intrepid, converted and deprived Mosaic of its property.  The information taken and used by Gamble as an employee and agent of Intrepid is worth hundreds of millions of dollars and its entire value has been impaired due to its use at Intrepid.

99.     As a result of the conduct of Gamble and Intrepid, Mosaic has suffered and will continue to suffer irreparable injury such that there is no adequate relief at law, and equitable relief must be granted.  Mosaic has also suffered tangible harms; damages for which are in the millions of dollars.  Accordingly, Mosaic is entitled to both equitable and legal relief.

100.   As a result of Gamble and Intrepid's bad faith, their intentional, malicious, and fraudulent conduct, which conduct evinces a grave indifference and reckless disregard for the rights of Mosaic, Mosaic is also entitled to punitive damages.

## COUNT VII

### (Civil Conspiracy—Against All Defendants)

101.   Mosaic re-alleges and incorporates by reference the allegations asserted in numbered paragraphs 1 through 100 of this Complaint.

102.   Gamble and Intrepid did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown,

    a.   to convert and use Mosaic's electronic files including its confidential and proprietary information concerning Mosaic's processes for manufacturing a high-quality agricultural product; and

    b.   to wrongfully access Mosaic's computers without authority and in excess of authority, and copy Mosaic's electronic files with the intent to use them at Intrepid.

103.   It was a purpose of the conspiracy for Gamble and Intrepid to unlawfully enrich themselves by, among other things, wrongfully accessing Mosaic's computers to obtain confidential and proprietary information, and then using such information for their own benefit and to the irreparable harm to Mosaic for the purposes of redesigning Intrepid's Lang processing plant.

104.   The manner and means by which Gamble and Intrepid sought to accomplish the object and purpose of the conspiracy included, among others, the following:

-   Solicitation of employment by Gamble under the false pretense of seeking employment from Intrepid as an "Environmental Engineer."

28

- Intrepid inducing and incentivizing Gamble to convert confidential and proprietary information by downloading Mosaic computer files without authorization and/or in excess of his authorized access by offering Gamble significant compensation increases, including performance-based bonuses and being willing to pay bonuses equal to lost retirement benefits to Gamble caused by his activity.

- Concealing the existence of the conspiracy by fraudulently fostering the impression that Gamble was negotiating continued employment with Mosaic, while in reality he was converting computer data from Mosaic with the intent to use it at Intrepid.

- Intrepid aiding, benefitting from, and ratifying Gamble's misconduct by agreeing to pay his legal fees arising out of his conduct, failing to discipline him despite acknowledged violations of company policy and admitted perjury, and promoting him despite his unlawful conduct.

- Using the converted computer files, obtained without authorization or in excess of Gamble's authorized access, to redesign Intrepid's Lang processing facility.

- Intrepid's failure to preserve evidence or prevent use of converted information obtained in violation of the CFAA from being used by Gamble in the course of his employment with Intrepid.

105.   In furtherance of the conspiracy, Gamble and Intrepid performed the following overt acts:

- Gamble converted Mosaic property worth hundreds of millions of dollars and brought it to Intrepid.

- Intrepid began using this property to convert its Lang processing facility to a replica of Mosaic's facility.

- When a forensic analysis by Mosaic revealed Gamble's and Intrepid's conversion of confidential and proprietary information and violations of the CFAA, Gamble and Intrepid took steps to conceal the conspiracy and misconduct.  When Gamble learned Mosaic might sue him for misappropriation of trade secrets, he claimed he destroyed USB thumb drives containing Mosaic's files and information.  Similarly, when Intrepid learned that Gamble had uploaded Mosaic files onto its computer systems, it concealed that fact from Mosaic for nearly a month, and violated mutually agreed procedures to hire an independent forensic analyst for Intrepid's laptop containing the files ensuring that independent forensic analysis of the laptop was not available to Mosaic at the preliminary injunction hearing in the state court.

106.   As a result of the conduct of Gamble and Intrepid, Mosaic has suffered and will continue to suffer irreparable injury such that there is no adequate relief at law, and equitable relief must be granted.  Mosaic has also suffered tangible harms; compensatory damages for which are in the millions of dollars.  Accordingly, Mosaic is entitled to both equitable and legal relief.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff The Mosaic Company requests that this Court enter judgment in its favor and against Steve Gamble and Intrepid as follows:

a. Injunctive relief, including an Order (1) prohibiting Gamble from using, disclosing, or misappropriating Mosaic's trade secret information or from otherwise engaging in any conduct that directly or indirectly violates the Confidentiality Agreement or his duties to Mosaic, (2) prohibiting Intrepid from requesting, seeking, obtaining, disclosing, misappropriating or using Mosaic's trade secret or confidential information obtained from Gamble or from any other source, (3) requiring that Defendants return to Mosaic all computer hardware and software that contain Mosaic's proprietary and confidential information, (4) prohibiting Defendants from any further use of information wrongfully obtained from Mosaic's computers, and (5) prohibiting Gamble from working for Intrepid;

b. Award Mosaic any and all monetary relief to which it is entitled including monetary damages for actual loss and unjust enrichment;

c. Award Mosaic exemplary damages arising out of Defendants' willful and malicious misappropriation of Mosaic's trade secrets;

d. Award Mosaic its reasonable attorney's fees and costs; and

e. Such other relief as the Court deems just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  March 22, 2018                         KEMP SMITH LLP

                                                            BY: */s/ Forrest Tahdooahnippah*
                                                            KATHRYN BRACK MORROW
                                                            3800 E. Lohman Ave., Suite C
                                                            Las Cruces, NM
                                                            575.527.0023
                                                            915.546.5360 (FAX)

katy.morrow@kempsmith.com

DORSEY & WHITNEY LLP
    RJ Zayed (to be admitted pro hac vice)
    zayed.rj@dorsey.com
    Forrest Tahdooahnippah (to be
    admitted pro hace vice)
    forrest@dorsey.com
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorneys for Plaintiff The Mosaic Company*