# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

Mosaic Potash Carlsbad, Inc.,

                            Plaintiff / Counterclaim Defendant,

vs.                                             CIVIL NO. 2:16-cv-00808-KG-SMV
                                                          2:17-cv-01268-KG-SMV

Intrepid Potash, Inc.,
Intrepid Potash-New Mexico, LLC, and
Steve Gamble,

                            Defendants / Counterclaimants.

## MOTION FOR PROTECTIVE ORDER FROM PLANT INSPECTION

Plaintiff Mosaic Potash Carlsbad, Inc. ("Mosaic") served a Rule 34 Notice to Inspect Defendants Intrepid Potash, Inc. and Intrepid Potash-New Mexico, LLC's (collectively, "Intrepid") plant to ascertain whether Intrepid is using any of the trade secrets that Defendant Steve Gamble ("Gamble") misappropriated, including those Gamble admits he downloaded onto flash drives and took with him when he left Mosaic for the purpose of using while at Intrepid. In response, Intrepid filed its own Rule 34 Notice to inspect Mosaic's plant. Intrepid did so even though there is no allegation or claim that Mosaic ever obtained or used any trade secrets belonging to Intrepid and even though Mosaic has provided Intrepid with a detailed description of Mosaic's trade secrets at issue in this case. Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Mosaic hereby moves for a protective order precluding Intrepid from engaging in a retaliatory, irrelevant, and disproportionate inspection of Mosaic's langbeinite processing and granulation facilities.

## INTRODUCTION

Although Gamble and Intrepid denied it several times, Gamble (at least) now admits that in the weeks and days leading up to the end of his employment with Mosaic, he stole from Mosaic

hundreds of confidential electronic files concerning Mosaic's trade secrets for processing the mineral langbeinite. He stole these files with the purpose of using them at a new job with Intrepid, Mosaic's only competitor in North America for the mining and processing of langbeinite. Thereafter, Gamble and Intrepid re-designed Intrepid's entire langbeinite processing facility and changed Intrepid's "granulation" formula. As a result, Intrepid's langbeinite recovery rate climbed quickly from an abysmal 30% towards Mosaic's langbeinite recovery rate, which at the time of Gamble's departure from Mosaic was better than 80%. Intrepid CEO Bob Jornayvaz has bragged to investors of the "better-than-anticipated" results of Intrepid's re-designed facility.

Accordingly, an inspection of *Intrepid*'s langbeinite facility (or facilities) is necessary to determine the extent to which Intrepid has benefited from Mosaic's stolen trade secrets. However, for the transparent and improper purpose of raising the stakes of this litigation for Mosaic (the victim), Intrepid responded immediately to Mosaic's inspection request by simply inverting the names on Mosaic's request and serving it back on Mosaic. Mosaic objects to Intrepid's improper inspection and disproportionate request. For good cause, as set forth below, the Court should grant Mosaic's motion for protective order.

Intrepid has no proper purpose to examine *Mosai*c's facility. Initially, Intrepid suggested[1] that it would like to see whether Mosaic is currently using its own trade secrets in its own langbeinite recovery process; however, this is not relevant under the New Mexico Uniform Trade Secrets Act ("NMUTSA"). Nor does Intrepid need to see Mosaic's trade secrets to "better understand them," as Intrepid suggested when the parties met and conferred on this motion. Mosaic's trade secrets are straight-forward, and an inspection of Mosaic's langbeinite recovery process will not help Intrepid

---

[1] Mosaic met and conferred with Intrepid pursuant to Local Rule 7.1(a) via telephone on March 21 and 28, 2018 and via email on March 21 and 22, 2018. Mosaic was unable to obtain Intrepid's concurrence in this motion (i.e., that Intrepid withdraw its request for an inspection).

"better understand" them.  Indeed, Mosaic has already disclosed to Intrepid the trade secrets at issue in this litigation in exacting detail – down to, e.g., the size (in units of "Tyler Mesh" which measures hole sizes to less than a thousandth of an inch) of the apertures in the screens used in its process. More importantly, Mosaic's burden of proof stops at its disclosure of the trade secrets it believes Gamble and Intrepid stole.  It does not extend to helping Intrepid "better understand" how to use stolen Mosaic trade secrets.

At best, Intrepid seeks to unfairly match Mosaic's discovery requests "tit-for-tat" without any regard for what discovery of each party is relevant, proportional, and otherwise appropriate.  Intrepid should not get a plant inspection simply because Mosaic does.  The parties are simply not in the same position.  Intrepid and Gamble stole Mosaic's trade secrets; Mosaic stole nothing from them. Through Gamble, Intrepid already had access to all of Mosaic's trade secrets including Mosaic's stolen documents and Gamble's own encyclopedic knowledge of Mosaic's langbeinite recovery process up to the time of his departure from Mosaic; Mosaic has had no similar access to information about Intrepid's processes.  And while Mosaic needs access to Intrepid's plant to determine the extent to which Intrepid is using stolen trade secrets, Intrepid does not need access to Mosaic's plant for any proper purpose.   Relevance and proportionality, not "tit-for-tat," are the governing rules for this discovery dispute.

Mosaic is justly concerned about revealing its current processes to Defendants in light of their previous conduct in this case.  In his deposition, Gamble admitted he downloaded hundreds of confidential Mosaic files onto USB drives with the intent to use them at Mosaic and he lied under oath to the New Mexico State Court, declaring he took nothing.  Then he destroyed the USB drives to prevent their discovery.  For its part, Intrepid did not discipline Gamble for this egregious conduct. Instead, Intrepid promoted him.  Given this undisputed conduct, Mosaic reasonably fears that

allowing Intrepid to inspect Mosaic's plant, Intrepid may further attempt to misappropriate Mosaic's current and innovative processes.  Since Gamble's departure for Intrepid, Mosaic has continued to improve its processes and, relatedly, its langbeinite recovery rate.  Today, Mosaic has additional trade secrets to protect from Intrepid's prying eyes.  And, Mosaic – as Intrepid no doubt appreciated in serving its inspection request – is understandably concerned about allowing its unscrupulous competitor within the confidentiality of its fence line.  Improperly, Intrepid seeks to raise the stakes of this lawsuit for Mosaic.  While Mosaic continues to work to determine what it already has lost as the victim of Gamble and Intrepid's misdeeds, Intrepid's motion threatens to expand that loss by further exposing Mosaic's confidential intellectual property to Intrepid's misappropriation.  Intrepid's inspection request is improper, unfair, and contrary to Rule 1 of the Federal Rules of Civil Procedure.

For these reasons, and the others stated below, Mosaic's motion for a protective order should be granted.

## BACKGROUND

This case concerns the misappropriation of trade secrets and theft of confidential electronic data from Mosaic by its competitor Intrepid.  The trade secrets and information involve processing of the mineral langbeinite into a premium fertilizer product.  Intrepid obtained Mosaic's trade secrets and confidential data from Mosaic's former employee, Gamble.

Gamble was employed by Mosaic or its predecessor companies for approximately thirty-nine years.  Tahdooahnippah Decl. Ex. 1 32:19-20, 39:14-16.  During this time, Gamble led Mosaic's langbeinite research and development efforts and was intimately involved with the design of Mosaic's langbeinite "processing" and "granulation" plants.[2]  *Id.* Ex. 2 22:23—23:25, 32:17—33:1,

---

[2] "Processing" usually refers to the separation of langbeinite particles from impurities such as salt. "Granulation" usually refers to the creation of granules of langbeinite from smaller langbeinite particles.

41:7-24.  In November 2014, unbeknownst to Mosaic, Gamble accepted a new job with Intrepid to

begin in January 2015.  *Id.* Ex. 3.  After accepting employment with Intrepid, Gamble downloaded

hundreds of confidential electronic files onto USB drives from Mosaic's servers to use at his new job

with Intrepid.  *Id.* Ex. 1 40:16-25, 45:1-23, 46:25—47:11.

      After beginning employment with Intrepid, Gamble began making recommendations to

Intrepid about how to re-design its langbeinite facility to be "Lang-only," the same type of facility as

Mosaic's (Intrepid's facility was previously designed to process different ore types).  *Id.* Ex. 4.  At

this time, Mosaic enjoyed a considerable competitive advantage over Intrepid; Mosaic's langbeinite

recovery rate was over 80% while Intrepid's was round 30%.  *Id.* Ex. 1 180:7-10.  During his work

with Intrepid, Gamble connected the USB drives full of Mosaic's electronic data to his Intrepid-

issued work computer.  *Id.* Ex. 1 48:2—50:18.  Gamble also accessed his Mosaic email account and

forwarded emails to his Intrepid email as well as deleted hundreds of other emails.  *Id.* Ex. 5.

      Mosaic commenced an action in state court (which was later removed and consolidated with

this action) asserting claims for, among other things, trade secrets misappropriation.  During the state

court action, Gamble twice submitted declarations stating, under penalty of perjury, that he had taken

nothing with him when he left Mosaic.  *Id.* Exs. 6-7.  Only when Mosaic files were discovered on his

Intrepid work computer did Gamble admit that he had taken hundreds of files from Mosaic to use at

Intrepid.  *Id.* Ex. 2 120:21—121:17, 126:18—128:25.  However, he further stated that he had

destroyed both these USB drives and deleted Mosaic's files off his work computer.  *Id.* Ex. 1 54:10-

24, Ex. 2 130:17—131:17. Shockingly, despite these admissions by Gamble, Intrepid did not

discipline him.  *Id.* Ex. 2 146:22-25.  Instead, Intrepid promoted him.  *Id.* Ex. 8.[3]

      Also while the action was pending in state court, Intrepid served an interrogatory asking

---

[3] Over a year later, Intrepid terminated Gamble.

Mosaic to identify the trade secrets it claims were misappropriated.  *See* 2d Tahdooahnippah Decl.

Ex. A.   Mosaic's identification of such trade secrets, however, was not a straightforward process

because it did not have access to the USB drives that Gamble used to take confidential and trade

secret files. Accordingly, Mosaic was forced to identify many trade secrets, including equipment,

equipment settings, process monitoring targets, formulas, and techniques, covering nearly every

aspect of its langbeinite processing and granulation.  *Id.*  Mosaic also produced (pursuant to New

Mexico's analog to Rule 33(d)) documents, including research and development files, totaling eighty-

seven pages, which Mosaic suspects were taken by Gamble on the USB drives because he accessed

those particularly sensitive files, along with many others, after accepting Intrepid's job offer.  *Id.* ¶ 3.

These pages include process flowsheets, a PowerPoint presentation, and technical testing documents

that explain in detail Mosaic's trade secrets.  *Id.*

Also during the course of this litigation, Intrepid re-designed its entire langbeinite facility and

also began using a new formula in its granulation process.  Tahdooahnippah Decl. Ex. 9.  Previously,

despite investing over $85 million over the course of several years, Intrepid was unable to improve its

recovery of langbeinite.  *Id.* Exs. 10-11.  Intrepid reversed its misfortune with the hiring of Gamble.

Armed with Mosaic's trade secrets, Gamble, within two weeks of his hiring, told Intrepid how to re-

design its facility from a mixed-ore facility to a langbeinite-only facility.  *Id.* Ex. 4.   Intrepid

announced its planned conversion in October 2015.  *Id.* Ex. 9.  By August 2016, no doubt with

assistance from Gamble, Intrepid announced that it had experienced a "better than anticipated ramp

up of Trio® [i.e., langbeinite] production."  *Id.* Ex. 12.  Evidencing its astonishingly accelerated

increase of langbeinite production, Intrepid stated that its production had increased more than 60%

compared to the prior year and was on track to *double*.  *Id.* In other words, Intrepid was able to

double langbeinite recovery within twenty months of hiring Gamble, when it had previously been

unable to improve recovery at all despite investing $85 million and spending several years

conducting a Langbeinite Recovery Improvement Program.

Accordingly, Mosaic indicated its intent to Intrepid to request an inspection of Intrepid's

facilities to assist in determining the extent to which Intrepid's re-design made use of trade secrets (or

other confidential information) disclosed to Intrepid by Gamble.  *See* ECF No. 57 at 22.  At that time,

Intrepid stated that it if Mosaic did so, it would request a reciprocal inspection of Mosaic's own plant.

*Id.*  On March 14, 2018, Mosaic served Intrepid with a notice of inspection, and on March 16, 2018,

Intrepid served Mosaic with a mirror image request.  *Id.* Exs. 13-14.

That Intrepid's request is a mirror image is notable.  It is not designed to obtain relevant

information.  The processes used at Mosaic's plant are not relevant—there is no requirement that

Mosaic be presently using its trade secrets (it is free to innovate on or replace methods without

sacrificing its trade secrets claims against Intrepid and Gamble).  This is particularly true here where

Gamble's knowledge and theft of files included *research and development* that was not necessarily

put into practice but would still be of commercial value in developing langbeinite processing and

granulation methods for Intrepid to use to compete with Mosaic.  Indeed, Intrepid's request asks to

inspect any changes Mosaic has made since Gamble *left* Mosaic—a transparent attempt to learn any

innovations Mosaic has made since Gamble left rather than conduct discovery actually relevant to

this case.  *See id.* Ex. 14 at (20).  Therefore, Mosaic now brings this motion for a protective order to

prevent Intrepid's inspection of Mosaic's facilities.

## ARGUMENT

### A.    Standard of Review

Rule 26(c) of the Federal Rules of Civil Procedure permits any party "from whom discovery

is sought" to "move for a protective order."  Fed. R. Civ. P. 26(c)(1).  Where "good cause" is shown,

the Court may issue an order forbidding discovery. *Id.* "Good cause" includes situations where a discovery request is outside the scope of discovery. *See Meeker v. Life Care Ctrs. of Am., Inc.*, 2015 U.S. Dist. LEXIS 119976, at *11 (D. Colo. Sept. 9, 2015) (granting protective order based on irrelevance of request). The scope of discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b).

### B. The Methods Mosaic is Currently Using for Langbeinite Processing and Granulation Are Not Relevant To Mosaic's Trade Secrets Claim

The first basis Intrepid offered for its request to inspect Mosaic's facility was its erroneous assumption that discovery in this matter should be symmetrical, i.e., if an inspection of Intrepid's facility is relevant then an inspection of Mosaic's facility must also be relevant. This is false. Mosaic is the victim of trade secrets misappropriation, and Intrepid and Gamble are the perpetrators. Therefore, *Intrepid's* use of Mosaic's trade secrets at its new, re-designed facility is relevant because unauthorized use by Intrepid of Mosaic's trade secrets is one type of misappropriation listed in the NMUTSA. N.M. Stat. Ann. § 57-3A-2(B)(2). And, in fact Intrepid's ability to substantially increase its langbeinite recovery after employing Gamble is highly suggestive that it did in fact use Mosaic trade secrets. However, Intrepid has never accused Mosaic of misappropriating trade secrets (and, in fact, despite Intrepid's improvement, Mosaic continues to have superior recovery rates, and therefore Mosaic would have no commercial use for information on Intrepid's inferior processes and formulas). Moreover, the NMUTSA has no requirement that Mosaic continuously use, or have ever used, its own trade secrets.

In fact, the NMUTSA expressly states that a trade secret can have "actual *or potential*" economic value. N.M. Stat. Ann. § 57-3A-2(D)(1) (emphasis added). As noted by the leading treatise on trade secrets law, this language was intentionally chosen to make clear that a plaintiff need

*not* continuously use its trade secrets in its business.  Prior to the promulgation of the Uniform Trade

Secrets Act, American common law generally *did* include a requirement that a plaintiff make use of

its trade secrets.   1-1 *Milgrim on Trade Secrets* § 1.01 (2017) (explaining that *The Restatement of*

*Torts* § 757, from 1939, noted that one was required to use a trade secret in a trade or business).

However, the Uniform Trade Secrets Act, which has been enacted in New Mexico and nearly every

other American jurisdiction, has *no* such requirement.   In other words, "the *Restatement of Torts*

requires a purported trade secret to be in continuous use in the owner's business to be entitled to

protection, *but* the UTSA has no such requirement."   1-1 *Milgrim on Trade Secrets* § 1.01 (2017)

(emphasis added).  As a result, "a class of matter previously protected not under trade secret law . . .

can now be protected under the UTSA."  *Id.*

The absence of a requirement to make continuous use of a trade secret in a plaintiff's business

makes sense from a practical perspective.  Take, as an example, the Coca-Cola classic formula (often

used as an example of the quintessential trade secret).  During the late 1980s, Coke replaced its

classic formula with the "New Coke" before reverting back to the classic formula (albeit with corn

syrup rather than cane sugar).  Surely it would have been an unjust result if a competitor in the 1980s

were allowed with impunity to steal the classic formula and put it to use merely because Coke was

using the New Coke formula in its place.  It would also be an unjust result if today a competitor were

allowed with impunity to steal the original classical formula (made with cane sugar) and put it to use

merely because Coke is now using corn syrup.  Therefore, the UTSA rule—that no use is required—

is the better rule from a practical perspective.

The case law is in accord—trade secrets can include research and development or other

information not currently in use as long as it has potential economic value.  For example, in *Sinclair*

*v. Aquarias Electronics, Inc.*, the plaintiff made a device capable of converting brain waves into

audible form, which the defendant misappropriated, improved upon, and commercialized.  42 Cal. App. 3d 216, 219-220 (Cal. Ct. App. 1974).  The Court held that the idea for the device was a trade secret even though the plaintiff had not himself commercialized the idea.  *Id.* at 222 ("Under these circumstances, appellant's claim that the inventor did not utilize the device in *his* own business is entirely immaterial and has no bearing whatsoever on the issue at hand.") (emphasis in original).  *See also Bertotti v. C.E. Shepherd Co.*, 752 S.W.2d 648, 653 (Tex. App. 1988) ("The fact that [plaintiff] was not actually *producing* film pack when [competitor] was formed is irrelevant.  The mere fact that a company is not utilizing information at the present time does not prevent that information from being a trade secret subject to protection.").  And, in *Skycam LLC v. Bennett*, the Northern District of Oklahoma excluded a financial report that did not assign any "present value" to a plaintiff's trade secrets because, like the NMUTSA, Oklahoma's trade-secrets statute "encompasses both actual and potential value."  2013 U.S. Dist. LEXIS 134736, at *37 (N.D. Okla. Sep. 20, 2013).  "Any probative value of [present-value] testimony," the court reasoned, "would have been substantially outweighed by confusion of the issues and misleading the jury."  *Id.* at *38.

Indeed, New Mexico courts have specifically recognized that trade secrets include not only knowledge of what methods can be implemented but also "negative knowledge"—methods a party "considered and *rejected*."  *Pincheira v. Allstate Ins. Co.*, 190 P.3d 322, 336 (N.M. 2008) (emphasis added).  As the New Mexico Supreme Court reasoned, knowing what does not work can give the holder of that knowledge "a competitive advantage as they develop competing products for the market."  *Id.* (citation omitted).[4]  In other words, being able to rule out methods is a short-cut that has economic value.

---

[4] Although the *Pincheira* court considered what qualified as a trade secret under New Mexico's trade-secret privilege, it explicitly followed the NMUTSA's definition of trade secret because "following a different definition . . . would create confusion in cases where both the [NMUTSA] and discovery or privilege are at issue." 190 P.3d at 327.

This is of particular significance in this case because many of the trade secrets that were misappropriated related to research and development.  Research and development were Gamble's responsibility while employed by Mosaic, and many of the files downloaded were research and development related.  Mosaic does not necessarily use 100% of all the methods, formulas, etc. that it researches or develops on a pilot scale.  Nonetheless, this information is of great economic value. Mosaic's research and development (as well as knowledge of the processes it was running as of December 2014) could give Intrepid a head start on developing competing processes, both by revealing what will work, what has worked in the past, and, importantly, what will not work.

Accordingly, while an inspection of *Intrepid's* plant is relevant to determine if it is in fact using that research and development in its own processes, a reciprocal inspection of *Mosaic's* plant is not relevant.  "Tit-for-tat" discovery simply has no place in this case: the relevance analysis for Mosaic and Intrepid is not symmetrical. The processes Mosaic currently uses at its facility are not relevant to any claim or defense in this action.  Therefore, inspection of Mosaic's facility should be denied.  *See, e.g.*, *Long v. United States Brass Corp.*, 2004 U.S. Dist. LEXIS 14762, at *11 (D. Colo. Aug. 2, 2004) (denying inspection of manufacturing plant where it was irrelevant and unnecessary to the action).

### C.  An Inspection is Not Necessary to "Understand" Mosaic's Trade Secrets

Tacitly conceding the irrelevance of Mosaic's current processes, Intrepid recently changed its argument during the meet and confer process.  Intrepid shifted its position from arguing that Mosaic needs to use its trade secrets to arguing that "if" Mosaic is using any of its trade secrets at its plant, Intrepid needs to inspect the plant in order to better "understand" Mosaic's trade secrets.

It is Intrepid's burden to demonstrate how Mosaic's use of a trade secret is relevant.  *Reibert v. CSAA Fire & Cas. Ins. Co.*, 2018 U.S. Dist. LEXIS 860, at *12 (N.D. Okla. Jan. 3, 2018).

Intrepid's bare assertion that it would be helpful to view Mosaic's trade secrets in action, assuming *arguendo* they are in use in the first place, does not meet its burden to show relevance.  Mosaic has already disclosed in detail what it claims its trade secrets are, and assuming that it uses any of those trade secrets, viewing them would be cumulative.

Indeed, Intrepid has *never* identified any trade secret that it claims it cannot understand.  In fact, Mosaic's trade secrets are straightforward.  They relate to equipment settings, optimal targets for various circuits, leach times, flow rates, granulation formulas, and similar information.  *See* Tahdooahnippah Decl. Ex. 9.  For example, one of Mosaic's trade secrets is the size of certain apertures in its screens.  The size of a hole in a screen is straightforward, Intrepid has never explained how a plant inspection would allow it to better "understand" this hole size.  As another example, Mosaic has identified a particular leach time as a trade secret.  Again, the amount of time is straightforward and Intrepid has never explained how a plant inspection would allow it to better "understand" an interval of time.  Intrepid's new argument fails to establish relevance, and a protective order should be issued.

> **D.    Inspection of Mosaic's Facility Is Disproportionate to the Needs of the Case**

Even if "understanding" Mosaic's trade secrets were relevant (and it is not), this thin reed of alleged relevance cannot warrant an intrusive inspection of Mosaic's facilities.  Mosaic has made innovations since Gamble's departure, Gill Decl. ¶ 3, that it should not be forced to disclose, especially where Intrepid and Gamble have already evinced a disregard for the discovery rules.  An inspection of Mosaic's facility would therefore be disproportionate to the needs of this case.

Under the Federal Rules of Civil Procedure, the scope of discovery includes only matters "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The proportionality analysis considers "the importance of the issues at stake in the action, the amount in controversy, the parties'

relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Here, the only remaining alleged relevance of an inspection of Mosaic's facility (again assuming Mosaic is using any of its identified trade secrets) is for Intrepid to better "understand" those trade secrets. Intrepid's subjective "understanding" of trade secrets that have *already been identified with particularity in response to Intrepid's interrogatories* is not an issue that has any importance to resolving any issues in this action. Intrepid has never articulated how viewing the application of straight-forward concepts, such as the size of a hole in a screen or the length of time of a salt leach, would assist in resolving any issues in discovery or issues in this case as a whole. Rather, viewing the application of these straight-forward concepts (to the extent they are used at Mosaic's plant) would only serve to assist Intrepid in implementing in its own facility (to the extent they have not already). The discovery process cannot be abused to assist in the misappropriation of trade secrets. *Cf. Pincheira*, 190 P.3d at 331-33 (discussing trade secret privilege in discovery).

Moreover, to the extent Intrepid has lingering questions about Mosaic's trade secrets, those questions (to the extent they are even relevant) could be resolved through less intrusive discovery means such as document productions. And, in fact, Mosaic has already produced nearly a hundred pages detailing and explaining its trade secrets, including engineering documents such as process flowsheets, a PowerPoint presentation, and testing documents. In the meet and confer process, Intrepid has never denied that it can use the documents produced by Mosaic to better "understand" the information Mosaic claims are its trade secrets. Instead, Intrepid merely has stated that if it can "understand" Mosaic's information through documents, then Mosaic should likewise be limited to documents rather than conducting an inspection of Intrepid's facility. But, Intrepid's argument

against rests on the mistaken assumption that the parties are identically situated when they are not.

In fact, Mosaic has already sought documents regarding Intrepid's redesigned plant and formulas only to be told that no such documents existed.  For example, one of Mosaic's trade secrets relates to targets used by a process monitoring and control system.  Mosaic sought documents regarding the targets used by Intrepid in its processing, monitoring, and control system as well as any changes thereto, only to be told by Intrepid that no such documents existed.  Tahdooahnippah Decl. Ex. 15.  As another example, Mosaic has claimed certain trade secrets related to something called a crushing circuit (where raw ore is crushed to smaller sizes).  Mosaic has sought (repeatedly) basic engineering documents called process flowsheets for the crushing circuit that would reveal what Intrepid's methods are, only to be told by Intrepid that it had no such flowsheets.  *Id.*  Mosaic similarly sought metallurgical balance information, which would reveal changes in processes, only to only be told once again that none existed.  *Id.* Ex. 16.  Accordingly, Mosaic's best available method of discovery for Mosaic to learn what methods Intrepid is currently using is an inspection of Intrepid's facility.  The same proposition cannot be said in reverse: what methods Mosaic is currently using are not relevant, and even if they were, other forms of less intrusive discovery (such as document inspection) are available.

In fact, the intrusiveness of a plant inspection is a huge burden on Mosaic.  Since Gamble's departure from Mosaic, Mosaic has continued to make improvement and innovations in its langbeinite processing and granulation methods and formulas.  Gill Decl. ¶ 3.  Allowing its competitor to view its recent innovations is a burden.  Repeating its "tit-for-tat" theme, Intrepid is likely to argue that it is equally burdened by Mosaic's request to inspect Intrepid's facility.  However, once again, the parties are not similarly situated.  Despite Intrepid's remarkable improvements in langbeinite recovery efficiency and production after employing Gamble, Mosaic's recovery is still

higher.  While Intrepid would derive a competitive benefit from seeing the processes at use in

Mosaic's facility, the same cannot be said of Mosaic, who could not commercially benefit from

obtaining information on Intrepid's inferior processes.

Furthermore, the only method of reducing the burden of exposing confidential and trade

secret information is to designate the inspection (and any photographs, recording, etc. thereof) as

"Attorney's Eyes Only" under the protective order.  However, under the protective order, Gamble is

entitled to see Attorney's Eyes Only information (necessarily so, given that he is currently *pro se*).

Gamble has already evinced a disregard for the rule of law—perjuring himself twice in denying

taking files from Mosaic, then when confronted with evidence of his perjury, admitting to

intentionally spoliating evidence.  Intrepid has likewise evinced a disregarding of the rule of law—

promoting Gamble despite his admissions of both perjury and intentional spoliation.  Therefore,

while no reason exists to think that Mosaic would not respect any Attorney's Eyes Only designations,

the same cannot be said for Defendants.  The burden associated with an inspection of Mosaic's

facility clearly outweighs whatever marginal benefit Intrepid claims it can derive from better

"understanding" Mosaic's straight-forward, documented trade secrets.   Intrepid's request for an

inspection of Mosaic's facility should be denied.

### E.    Intrepid's Request was Made for the Improper Purpose

In fact, the lack of relevance of an inspection of Mosaic's facility coupled with the burden it

would impose on Mosaic makes clear Intrepid's ulterior motive in requesting such an inspection.  By

requesting an inspection of Mosaic's facility, Intrepid is hoping to raise the stakes of this litigation and

deter Mosaic from pursuing its claims.  Intrepid's motive is transparent given that it expressly

requested to inspect the changes Mosaic made *since* Gamble's departure.  *See* Tahdooahnippah Decl.

Ex. 14 at (20).  These innovations are not within Gamble's knowledge, could not be part of the files he

took, and cannot arguably be a part of this case. The only purpose of such an inspection would be to jeopardize Mosaic's confidential information.

Indeed, Intrepid was clear from the beginning that it intended to request a reciprocal inspection of Mosaic's facility if Mosaic requested an inspection of Intrepid's. EFC No. 57 at 22. But, as discussed above, Intrepid's rationale shifted. First, it needed an inspection because there was a requirement that Mosaic use its trade secrets. After Mosaic presented authority noting the lack of such a requirement, Intrepid shifted to requesting an inspection of Mosaic's facility to better "understand" Mosaic's trade secrets (to the extent any were even being used). Intrepid's shifting target betrays its true purpose, which is not to seek legitimate discovery but instead merely to foist additional burden on Mosaic in retaliation for Mosaic's (legitimate) need to conduct an inspection of Intrepid's facility.

The implicit danger to Mosaic is that Intrepid will indeed "understand" Mosaic's trade secrets better. It will better understand how to implement the changes that Gamble already began making in the re-designed plant. It will also better understand how to innovate further on the changes that Gamble suggested to improve langbeinite recovery. In short, while Mosaic has requested an inspection of Intrepid's facility in order to determine the extent to which it has lost some of its competitive advantage due to disclosure of intellectual property by Gamble, Intrepid is requesting an inspection of Mosaic's facility only in order to further those losses. This is not a proper purpose of discovery, and a protective order should be issued protecting Mosaic from such harassment.

## CONCLUSION

For the foregoing reasons, Mosaic respectfully requests that its motion for protective order be granted.

Dated: April 6, 2018                    KEMP SMITH LLP


                                        */s/ Forrest Tahdooahnippah*
                                        Kathryn Brack Morrow
                                        katy.morrow@kempsmith.com
                                        3800 E. Lohman Ave., Suite C
                                        Las Cruces, NM
                                        575.527.0023
                                        915.546.5360 (FAX)

                                        DORSEY & WHITNEY LLP
                                        RJ Zayed (pro hac vice)
                                        zayed.rj@dorsey.com
                                        Forrest Tahdooahnippah (pro hace vice)
                                        forrest@dorsey.com
                                        Suite 1500, 50 South Sixth Street
                                        Minneapolis, MN 55402-1498
                                        Telephone: (612) 340-2600
                                        Facsimile: (612) 340-2868

                                        *Attorneys for Plaintiff Mosaic Potash Carlsbad
                                        Inc.*